Case No. 1:20-cv-00427-BLW   Inmate Name: Barcella
Date 11/19/20   Inmate IDOC#: 56305
Document Title: Motion for Appt. of Expert Witness
Total Pages: 15   Inmate Initials Verifying Page Count: GB
Document(s) ___ of ___

Gerald Angelo Barcella 56305
ISCI Unit 13
P.O. Box 14
Boise, Idaho 83707

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

Gerald Angelo Barcella
    Plaintiff

v.

Corizon LLC, Several
Unnamed Members of Corizon
UMT, Dr. Rebekah Haggard,
Gen Brewer, D.O.N., Rona
Siegert, CCHP-RN,
Warden Alberto Ramirez,
Director Josh Tewalt,
John Does I.-X.

Case No. 1:20-cv-00427-BLW

MOTION FOR APPOINTMENT OF EXPERT
WITNESS PURSUANT TO FEDERAL
RULES OF EVIDENCE 706 AND IDAHO
RULES OF EVIDENCE 706 AND
DECLARATION IN SUPPORT OF MOTION

COMES NOW, Gerald Angelo Barcella, Plaintiff in the above listed matter humbly requesting this Honorable Court grant Plaintiff's Motion For Appointment Of Expert Witness Pursuant To Federal Rules Of Evidence 706 and Idaho Rules Of Evidence 706.

## I. INTRODUCTION

To fairly present and develop his case, Plaintiff needs expert witness testimony in the fields of neurosurgery, nephrology and possibly pain management, and pharmacology.

Plaintiff, in addition to this motion, has filed a Brief In Support of Plaintiff's Motion For Appointment of Counsel. That motion was filed with Plaintiff's 42 U.S.C. Complaint on August 27, 2020.

Initial Review Order, p. 17 states that this Court would reconsider Plaintiff's request for appointment of counsel. In conjunction with any

MOTION FOR APPOINTMENT OF EXPERT WITNESS - 1

granting of that motion, Plaintiff humbly requests this Honorable Court grant Plaintiff the opportunity for appointed counsel to obtain expert witness opinion and testimony for this case.

If this Court denies Plaintiff's Motion For Appointment Of Counsel, Plaintiff requests this Court appoint expert witnesses for Plaintiff or allow him the opportunity to try to find expert witnesses as allowed under Fed. R. Evid. 706 and Idaho R. Evid. 706.

This Honorable Court said it would reconsider Plaintiff's request for Court appointed counsel after reading Defendants' Response to Plaintiff's Motion For Preliminary and Permanent Injunction & A Temporary Restraining Order, and Plaintiff's Reply to Defendants' Response to see what Plaintiff's chances might be of prevailing on the merits of his claim.

## II. BACKGROUND

Plaintiff has been incarcerated for over 25 years, is a prisoner of the Idaho Department Of Corrections (IDOC), since 1998, and has resided at Idaho State Correctional Institution (ISCI) since January, 2017.

Since 2017, Plaintiff has logged over 100 Health Services Requests (HSRs) Inmate Concern Forms (ICFs) and Open Clinic (OPC) visits complaining of pain and injury for serious lower back and sciatic pain first diagnosed in 2006.

Plaintiff has also filed multiple ICFs and Inmate Grievances concerning Defendants' prescription of highly nephrotoxic and hepatoxic NSAID pain relievers as the basis of Plaintiff's care for 21 years resulting in chronic kidney disease. Ineffective drug therapy was part of the circular care.

Since 2017 Defendants have engaged Plaintiff in multiple cycles of "circular care" forcing him to start the same ineffective care over "from the beginning", including multiple rounds of pain and injury worsening physical

therapy (P/T) and Home Exercise Program (HEP).

Plaintiff's 2017 MRI Impression reads: "Multilevel degenerative changes of the lumbar spine with multilevel spinal canal and foraminal narrowing." Declaration of Gerald Angelo Barcella 11/04/20 (Decl G.A.B.) (See also x-rays).

Plaintiff's x-ray results compared between 2017 and 2019 show Plaintiff's back injury progressing from "significant" to "severe" with new manifestations.

After, at least, six denials of provider offsite surgical consult (OSS) referrals, Corizon Utilization Management Team approved Plaintiff to see neurosurgeon William Bradley on October 21, 2019.

At that appointment Dr. Bradley went over, in depth, Plaintiff's 2017 MRI with him and told Plaintiff that he (Bradley) was sure that Plaintiff's injury had significantly worsened since then. The specialist neurosurgeon told Plaintiff that he would probably be in pain for the rest of his life due to Corizon's failure to act since the time of Plaintiff's MRI.

Dr. Bradley ordered epidural steroid injections (ESIs) in lieu of surgery at that time and ordered a follow-up in clinic two to three weeks after the injections to see if they worked.

Dr. Bradley said if the injections did not work he would probably order a new MRI and discuss surgery at the follow-up.

Corizon UMT approved the ESIs, but they immediately denied the follow-up in clinic.

The ESIs failed to bring relief and Plaintiff filed multiple HSRs and ICF's and an Inmate Grievance seeking further treatment and scheduling of the denied follow-up, both before, and after the failed injections due to new and worsening acute pain and symptoms and increasing chronic pain.

On August 27, 2020 Plaintiff filed a 42 U.S.C. § 1983 Complaint,

MOTION FOR APPOINTMENT OF EXPERT WITNESS - 3

a Motion For Appointment Of Counsel, and a Motion For Preliminary And Permanent Injunction & A Temporary Restraining Order.

In its Initial Review Order, p. 16, 17 this Court ordered, "Defendants must respond to the motion for temporary and preliminary injunctive relief within **14 days** after entry of this Order to show cause why Plaintiff should not be provided with a video conference appointment or in-person appointment with Dr. Bradley or an equivalent provider, if the follow-up has not already been scheduled.

In the Initial Order, p. 17 this Court stated, "Plaintiff's Motion for Appointment of Counsel is DENIED without prejudice, pending receipt of Defendants' Response to the preliminary injunction motion, which will give the Court an opportunity to hear from the other side on the potential merits of the case."

On October 23, 2020 Defendants filed their Response to Plaintiff's Motion for Preliminary Injunction. On November 5, 2020 Plaintiff filed his Reply to the Defendants' Response.

On October 27, 2020 Plaintiff was sent to Dr. Bradley's office where he met with P.A. Steve Wren who ordered a lumbar MRI, back x-rays and an electromyograpy (EMG) test. Decl. G.A.B. 11/04/20, p. 11-13.

Plaintiff noted a significant reduction in reception at Dr. Bradley's office. P.A. Wren stated he knew that a federal court order necessitated Corizon sending Plaintiff for the appointment and P.A. Wren would not deny that Corizon had provided their office with negative information concerning Plaintiff's injury and symptoms. Plaintiff gave Mr. Wren accurate data about his condition. Decl. G.A.B., 11/04/20, p. 11-13

Plaintiff firmly believes Corizon has tried to harm or bias Dr. Bradley's

MOTION FOR APPOINTMENT OF EXPERT WITNESS - 4

opinion of Plaintiff, his pain and symptoms.

### III. ARGUMENT

Plaintiff further believes, pending discovery processes, that he can overcome any motions for summary dismissal pursuant to Fed. R. Civ. P. 56. In light of evidence produced thus far, Plaintiff will prevail on the merits of his claim, and he meets requirements of substantive law. There are disputed material facts in this case that require to jury to decide upon.

At this early stage of the proceedings Plaintiff has provided significant scientific, documentary, eyewitness declarations, and medical records showing Plaintiff has met the objective and subjective stanards of substantive law governing ths type of case. Ex. A, Ex. IV.-XVII., Decl.G.A.B.11/04/20.

In addition to all the reasons listed in Plaintiff's Complaint, and for all the reasons listed in Defendants' Response to Plaintiff's Motion for Preliminary Injunction and Plaintiff's Reply to that Response, it appears that Defendants' may have denied Plaintiff effective care because they felt that he used up his financial allotment of care. Defendants' assert that Plaintiff, "has received extensive healthcare treatment both onsite and offsite, and has received various procedures and surgeries offsite, including vein stripping surgery, shoulder surgery, hernia surgery, and steroid injections for his knees, hips, and back." Defendants' Response, 10/23/20, p. 8 Worley Decl., #5

Defendants assertions of mere medical malpractice and Plaintiff having a disagreement with his providers fail miserably in light of the record and substantive and U.S. Supreme Court and Ninth Circuit law, and fail in

comparison to the entries in Exhibit A which is roughly a basic rendition of Plaintiff's medical record for the last year or so.

Discovery and disclosure processes, depositions, admissions, and interoggatories have yet to be disclosed or taken. Further documentation in Plaintiff's medical file in combination with other pretrial processes and Plaintiff's current evidence will show clear and convincing evidence of Defendants' deliberate indifference to Plaintiff's serious medical needs.

Leaving a patient to suffer constant, often horribly excruciating, pain for years as his condition deteriorates cannot be explained away as mere medical negligence, malpractice, or a difference of opinion.

In Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996) the Court stated:

> It is settled law that deliberate indifference to serious medical needs of prisoners violates the Eight Amendment. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291 50 L.E.d.2d 251 (1976). "Prison officials are indifferent when they deny, delay, or intentionally interfere with medical treatment." Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992). For a right to be clearly established it is not necessary that the very action in question have previously been held unlawful. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). To define the law in question too narrowly would be to allow defendants "to define away all potential claims. Kelly v. Borg, 60 F.3d 664, 667 (9th Cir. 1995.

Defendants have intentionally interfered with Corizon providers offsite surgical referrals at least six times and refused to send Plaintiff to Dr. Bradley's ordered follow-up in clinic after the failed ESIs.

Defendants cannot claim their actions were "accidents" or a one-time occurrence.

In Snow v. McDaniel, 681 F.3d 978 (9th Cir. 2012) the Court noted:

> The record shows that the defendants provided medical care, medications, and specialist referrals to Snow during the period in question. Even so, "[a] prisoner need not prove that he was

completely denied medical care" in order to prevail. <u>Lopez v. Smith</u>, 203 F.3d 1122, 1132 (9th Cir 2000) (<u>en banc</u>). Here, Snow may prove deliberate indifference by showing that prison administrators or physicians denied, delayed, or intentionally interfered with surgery for his hip condition, or that the way prison staff delivered medical care indicated deliberate indifference. <u>See id.</u> (citing <u>Estelle</u>, 429 U.S. at 105, 97 S.Ct. 285)

For Plaintiff to fairly, fully and adequately present his claims that Defendants course of treatment for Plaintiff and their lack of treatment was medically unacceptable, Plaintiff will require expert witness testimony.

The Court goes on to discuss defendants in <u>Snow</u> depending on their own non-specialist providers.

As in <u>Hamilton v. Endell</u>, 981 F.2d 1062 (9th Cir. 1992), the circumstances here raise an inference that the defendants were unreasonably relying on their own non-specialized conclusions with deliberate indifference to Snow's medical needs.

Plaintiff's case and Snow's have multiple similarities. Just as Defendants in this case have improper motives, so did the defendants in Snow's case. Improper motive can conclude that a defendant acted with deliberate indifference. Defendants claims that they provided extensive treatment for the same and other conditions indicates that they need not provide anything but cursory treatment for Plaintiff's back injury.

Just as Defendants in this case chose to pharmacologically treat Plaintiff, so did the defndants in Snow's case. As a matter of fact, Defendants in Snow's case prescribed the NSAID Indocyn to Snow, until his creatinine[1] levels rose dangerously high and threatened his life.

Just like Snow, Plaintiff's levels rose to a very high level. Fortunately for Snow, he was only on Indocyn for a short period of time. Unfortunatley for Plaintiff, in this case, he was on the drug for up to 21 years.

> Creatinine, a substance formed from the metabolism of creatine, commonly found in blood, urine, and muscle tissue. It is measured in blood and urine tests as an indicator of kidney function. Normal adult blood levels of creatinine are 0.5-1.1 mg/dL for females

MOTION FOR APPOINTMENT OF EXPERT WITNESS - 7

Plaintif's medical record shows diminished kidney function in blood panel results of significantly compromised glumerular filtration rates (GFR) and elevated creatinine levels. These compromised function readings begin in the early 2000s and are noted in Plaintiff's recent medical records. Exhibit A, p. 19, 38. Definitions for Glomerular Filtration Rates can be seen in Decl. G.A.B. 11/04/20, p. 5, footnotes 3,4.

In her Declaration, Defendant Worley conspicuously fails to mention Plaintiff's January 13, 2020 blood panel results showing a GFR of 41 and a creatinine level of 1.78. GFR was VERY low and Creatinine was Very high. Nor does Worley mention Plaintiff's GFR readings in the 30's multiple times over the last 15 years. Worley claims Plaintiff only suffers "mild kidney damage." Decl. Worley, p. 9, # 25 and, "Stage 2 kidney disease indicates mild kidney disease" Decl. Worley, p. 9, # 25.

Plaintiff asserts that if his kidney disease were so "mild" it would probably listed as stage 1 or stage 3, whatever the lesser stage might be, and he would not have to take a maximum dose of Furosamide everyday so he can urinate and to prevent significant water retention that he wakes up with every morning even taking the diuretic drug.

Worley contends that Plaintiff's kidney disease was not caused by Corizon's over prescription of NSAIDs since 1998. Decl. Worley, p. 9, # 29.

Worley further stated that her opinions are based on "a reasonable degree of medical certainty." Decl. Worley, p. 10, # 31. Worley, however, is not a nephrologist, she is not an internal specialist, nor is she a medical doctor.

> and 0.6-1.2 mg/dL for males; the numbers decrease in elderly patients because of a smaller muscle mass. <u>Mosby's Medical Dictionary, Tenth Edition</u>, 2017

Blood tests are not treatment. Corizon made Plaintiff wait until his liver disease was at Stage 3/Stage 4 before they would treat that. They denied care for over eight years despite Plaintiff's incessant requests for treatment. They seem to be doing the same here. Unfortunately, Plaintiff's kidney damage probably cannot be reversed.

If Defendants' children or grandchildren suffered Stage 2 Kidney disease would they consider it of no consequence as they do here?

In <u>Snow v. McDaniel</u>, 681, F.3d 978 (9th Cir. 2012), defendants indicated:

> Dr. Rhodes indicated that Snow's condition was an "emergency," and that although it significantly affected Snow's quality of life, it was not life-threatening. As <u>a short-term measure</u> to offer Snow relief until he was able to get <u>hip surgery, Dr. Rhodes prescribed a non-steroidal anti-inflammatory drug (NSAID) called Indocyn.</u>

(Emphasis by Plaintiff).

> In July, Dr. Bishop referred Snow to NDOC's Regional Medical Facility, a facility that provides full-time medical care for inmates, because Snow's creatinine levels were very high. Dr. Bishop concluded that Snow's ceratinine levels were going up because of the NSAIDs he was taking to manage his severely degenerated hips. Dr. Bishop submitted an "urgent" request to the URP for Snow to receive hip surgery, writing that Snow "[n]eeds a hip surgery[;] creatinine rapidly rising on needed pain meds." In contrast to the request for surgery in January, Dr. Bishop changed his mind and stated that Snow's medical problem was "potentially life threatening."

> Later, because the NDOC could not provide Snow with enough of the analgesic balm prescribed by Dr. Mar, NDOC medical staff supplemented Snow's medication regimen with oxycodone, a powerful narcotic. NDOC medical staff subsequently prescribed a regular dose of oxycodone to allow Snow to be able to get through the day.

These excerpts from <u>Snow id.</u> exemplify several similarities between that case and Plaintiff's. First off, is that both Plaintiff and Snow were both prescribed the nephrotoxic and hepatoxic drug Idocyn for pain. Fortunately, for Snow, the side-effects of the drug were documented early on and it was discontinued; hopefully before Snow recieved permanent kidney

damage. In lieu of the drug he was (1) put on the narcotic pain killer oxycodone and (2) he was given the corrective surgery that he needed.

It is noted that Plaintiff was never given any effective pain medication, narcotic, or otherwise. As a matter of fact, Plaintiff never received anything but minimal relief from the drug Indocyn, never attained any relief from any other drugs prescribed for Plaintiff's back and sciatic pain, and was told, "Corizon doesn't like to give narcotics for chronic pain," by N.P. Rogers on March 31, 2020. Plaintiff consistently complained of drug insufficiency.

As a matter of fact, Plaintiff never attained any relief from any of the drugs prescribed to Plaintiff for his pain, except for the minimal effects that Plaintiff thinks he may have received from the Indocyn.

Plaintiff had the end of his arm sawed off, in a shoulder replacement surgery and had a one-inch by 16 inch steel shaft implanted in his left arm in 2018. While the oxycodone he received post surgery relieved what little pain he felt from the surgery, <u>it did nothing to dull the horribly excruciating sciatic pain</u> that Plaintiff suffered at that time.

Plaintiff deduces that his pain may be significantly worse than Snow's. No analgesic balm or drugs have significantly diminished his pain.

Indocyn is well-known in the medical community to have the side-effects of renal toxicity, and it should only be prescribed to "[u]se the lowest effective dose for the shortest duration consistent with individual patient treatment goals." p. 7 and p. 4 respectively. Indocyn should not be prescribed in conjunction with diuretic drugs p. 12, and to "observe patients for signs of worsening renal function, in addition to assuring diuretic efficiency"webmd.com

Defendants claim Plaintiff did not "cooperate" with their treatment by refusing to take morning doses of Gabapentin that gave him serious negative side-effects and did not mitigate his pain. Decl. Worley, p. 4, #9, p. 7, # 21.

MOTION FOR APPOINTMENT OF EXPERT WITNESSES - 10

The drug Gabapentin, that Defendants tried to force Plaintiff to take in the mornings caused him nausea, anxiety, dizziness, and a feeling of being "loopy" (intoxicated). Plaintiff told Worley he could not take this medication in the mornings due to these side-effects. Exhibit A, Plainitiff's medical record, p. 8, OPC Notes, Worley and Decl. G.A.B. 11/04/20, p. 9, #66-68.

MedlinePlus, http://medlineplus.gov.druginfo/meds/a694007.html staes, in part:

> tell your doctor and pharmacist what prescription and nonprescription medications, vitamins, nutritional supplements, and herbal products you are taking or plan to take. Be sure to mention any of the following: antidepressants;...
>
> tell your doctor if you have ever had lung or <u>kidney disease</u> (emphasis by Plaintiff).
>
> you should know that this medication may make you drowsy or dizzy, may slow your thinking, and may cause loss of coordination. ....
>
> There is a risk you may experience changes in your mental health.... You, your family, or your caregiver should call your doctor right away if you experience any of the following symptoms: panic attacks; agitation or restlessness; new or worsening irritablility, anxiety, or depression; ....
>
>   page 3
>
> **What side effects can this medication cause?**
>
> **Gabapentin may cause side effects. Tell your doctor if any of these symptoms are severe or do not go away:**
>
> drowsiness
> tiredness or weakness
> unsteadiness
> anxiety
> nausea
>   page 4

Plaintiff has kidney disease, is and was on diuretics, and suffered the mentioned side effects of Gabapentin. Defendant Worley in her Declaration ignores that I told her I experienced these symptoms. An expert witness specializing in pharmacology may be needed to testify to the symptoms of this drug, and its interactions with the diuretics and strong antideppressants

MOTOIN FOR APPOINTMENT OF EXPERT WITNESSES - 11

that Plaintiff has been on for 15 and 11 years respectively.

In <u>McGuckin v. Smith</u>, 974 F.ñd 1050 (1992) the Ninth Circuit Court of Appeals noted, "that McGcukin had possible radiculopathy; in order to rule out a herniated disk, Medlen recommended that either a CT scan or MRI be performed." Plaintiff was similarly diagnosed with "radiculopathy" by Dr. Bradley On October 21, 2019. Exhibit A, p. 34 Spine and Cranial Surgery-Meridiann p.5, Impression:"Right lumbrosacral radiculopathy secondary to foraminal stenosis...."

[18] Like Plaintiff, McGuckin was a pro se plaintiff who had suffered "for over three-and-one-half before the surgery required to correct his painful condition was performed...." Plaintiff has suffered for fourteen years and has been fighting relentlessly for effective treatment since early 2017, when his pain began to significantly worsen.

In their <u>Conclusion</u>, the Ninth Circuit Court noted the difficulties facing pro se prisoners and the inadequate treatment they receive as prisoners:

> In many ways, this case, like <u>Wood v. Housewright</u>, 900 F.2d 1332 (9th Cir. 1992), exemplifies both the problems confronted by incarcerated <u>pro se</u> litigants and the shortcomings of our response to their unique needs. As did Wood, McGuckin may well have a valid claim under ß 1983 that his federal constitutional rights were violated by his woefully inadequate medical treatment during the time he was incarcerated. It is likely, however, that procedural errors made by McGuckin--like those made by Wood--will doom his efforts to be compensated (however minimally) for that deprivation or for the pain that he suffered for over three years. Unfortunately, without appointed counsel, McGuckin will undoubtedly *1063 not be the last <u>pro se</u> civil rights litigant to fall victim to prcedural pitfalls.

Plaintiff has already suffered for years as did McGuckin. He does not wish to be denied the proper medical care he needs, or to make mistakes and end up with procedural errors costing him compensation for his suffering. Plaintiff does not wish to become a McGuckin or Wood.

MOTION FOR APPOINTMENT OF EXPERT WITNESSES - 12

Defendants continue to deny there is anything wrong with Plaintiff, even denying his renewal for a bottom bunk memo, on October 22, 2020, that he has had for much of the last 15 years, requiring imminent climbing up and down a five foot high bunk. Hours before filing, an exception was granted.

Statements by Corizon UMT members denying Plaintiff's OSS referrals are part of his medical recard, but they were conspicuously missing from Exhibit A provided by Defendants. When their correct names are added to this complaint through discovery, they too will surely deny anything wrong with Plaintiff and their recommended "care."

On April 26, 2020, Plaintiff sent a letter and HIPAA release to Dr. Bradley, and had his girlfriend call his office, requesting a telephonic conference between Plaintiff and Dr. Bradley. This was denied because their constituent status, and contract, with Corizon prevented such.

No medical professional wishes to be involved with a litigant. Corizon's negative input against Plaintiff, to Dr. Bradley's office, may concern Dr. Bradley. Decl. G.A.B. 11/04/20, p. 11, #80-89. Dr. Bradley already had concerns about working on a prisoner when he saw Plaintiff on October 21, 2019. Complaint, p. 6, #45. He was concerned over a lack of follow-up care at ISCI.

The Statements of neurosurgeon Bradley, and P.A. Wren, that Plaintiff may be in pain for the rest of his life, and his pain may not be able to be resolved due to the injury being irreparable, because it is over two years old, show how serious Dr. Bradley, and his P.A., consider Plaintiff's injury and the ineffective treatment provided due to deliberate indifference.

No matter Dr. Bradley's diagnosis and treatment, or inability to treat, expert witness testimony regarding community standard of care and Plaintiff's pain, imminent pain and impacted ADLS will be required.

## IV. CONCLUSION

Plaintiff humbly requests this Honorable Court reference Plaintiff's Reply To Defendant' Corizon, LLC, Dr. Rebekah Haggard, Gen Brewer, And Selah Worley's Response to Plaintiff's Motion For Preliminary and Permanent injunction & A Temporary Restraining Order, Declaration of Gerald Angleo Barcella 11/04/20, Plaintiff's Exhibits IV.-XVII., 11/06/20 and Exhibit A.

Plaintiff believes he will prevail on the merits of his claim, more evidence in Plaintiff's favor will be rpesented as this case moves forward and evidence so far shows that issues of material fact that are triable are present.

For all the foregoing reasons in this motion, and stated in referenced documents, Plaintiff requests this Honorable Court appoint expert witnesses in the fileds of neurosurgery and nephrology, and, if needed in the fields of pain management and pharmacology, or in the alternative for only neurosurgery.

Filed alongside this Motion, Plaintiff has filed a Brief In Support Of Plaintiff's Motion For Appointment Of Counsel. Plaintiff will be greatly aided by appointment of counsel in many ways including locating, appropriating and coordinating expert witnesses.

For these reasons Plaintiff humbly requests this Honorable Court appoint expert witnesses pursuant to Federal Rules Of Evidence 706 and Idaho Rules Of Evidence.

Respectfully submitted this 18th day of November, 2020.

Gerald Angelo Barcella

MOTION FOR APPOINTMENT OF EXPERT WITNESSES — 14

CERTFICATE OF SERVICE

I, Gerald Angelo Barcella, certify that on this 18th day of November, 2020, I caused to be served a true and correct copy of the foregoing document to the below named individuals by giving it to the ISCI paralegal for electronic filing and/or mailing.

                                                               Gerald Angelo Barcella

Kevin West
Dylan Eaton
Parsons, Behle & Latimer
800 W. Main St., Suite 1300
Boise, Idaho 83702

Robert A. Barry,
Deputy Attorney General for Idaho
Mark Kubinski,
Deputy Attorney General for Idaho
1299 N. Orchard STt., Ste 110
Boise, Idaho 83706