UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD ANGELO BARCELLA,<br><br>             Plaintiff,<br><br>    v.<br><br>CORIZON, LLC, DR. REBEKAH HAGGARD, GEN BREWER, RONA SIEGERT, WARDEN ALBERTO RAMIREZ, and SELAH WORLEY,<br><br>             Defendants. | Case No. 1:20-cv-00427-BLW<br><br>**ORDER** |

Pending before the Court in this prisoner pro se civil rights matter are various motions filed by the parties, including Plaintiff Gerald Angelo Barcella's Motion for Temporary and Preliminary Injunction (Dkt. 5) and Motion for Appointment of Expert Witness with a renewed request for appointment of counsel (Dkt. 40). The motions are now adequately briefed. Having reviewed the parties' briefing and the record in this matter, the Court determines that oral argument is unnecessary and enters the following Order.

### BACKGROUND

Plaintiff is a prisoner in the custody of the Idaho Department of Correction ("IDOC") currently incarcerated at the Idaho State Correctional Center ("ISCI"). Plaintiff has been incarcerated for about 22 years and has suffered from back pain and radicular

**ORDER - 1**

pain for 13 years. Over the past several years, his back pain has worsened to the degree he now describes it as "excruciating." He has sciatic pain and other nerve pain radiating into his legs, hips, buttocks, and testicle. Plaintiff asserts that the sedentary lifestyle brought about by COVID-19 has increased his pain. In addition, Plaintiff once was able to find relief from lying on his stomach, but that position no longer relieves his pain. He has attended physical therapy and performed home exercises, which did not help and sometimes increased his pain.

Medical providers approved an off-site specialist appointment with neurosurgeon William Bradley for October 21, 2019. After an examination, Dr. Bradley told Plaintiff that he thought Plaintiff's pain was caused by foraminal narrowing at the L4-L5 and L5-S1 levels of the lumbar spine. Dr. Bradley wanted to first try steroid injections before considering surgery, with follow-up to occur two to three weeks after the injection. Dr. Bradley explained the potential dangers of back surgery to Plaintiff. In accordance with Dr. Bradley's advice, Plaintiff received an off-site spinal steroid injection on February 21, 2020.

Also in February 2020, Nurse Practitioner Selah Worley offered a home exercise program and another round of physical therapy to Petitioner, but Petitioner asserts that he had already tried those options and that NP Worley's proposed solutions were of the type that increased, rather than decreased, his pain. (Compare Dkt. 31-1, p. 4, with Dkt. 36, p. 7.)

**ORDER - 2**

A few weeks later, on March 3, 2020, Plaintiff reported to prison medical personnel that the steroid injections did not help the pain. He requested that he be scheduled for the off-site follow-up consultation recommended by Dr. Bradley. As of the date he filed the Complaint, August 27, 2020, Plaintiff had not been scheduled to return to Dr. Bradley. In response to Plaintiff's grievance, medical personnel cited "COVID-19" as their reason that he had not yet been sent to the specialist for an MRI and surgery consultation. NP Worley now says that, despite Dr. Bradley's recommendation for a follow-up appointment if the steroid injection did not work, she determined a follow-up visit was not necessary. (Dkt. 31-1, p. 3.)

At this time, Plaintiff's pain is not relieved by lying down or remaining stationery, and so, despite his pain, Plaintiff carries on with his regular life activities the best he can, because he is in pain *no matter what he does*. He says medical providers told him that, because he continues to work, sometimes as a janitor and sometimes as a worker in Correctional Industries, (1) his maintenance treatment is adequate, (2) they are justified in not providing him with surgery, and (3) they will not provide further medical care until he becomes debilitated. Defendants' declarations in support of their filings generally support Plaintiff's assertions. Defendants also seem to assert that, because Plaintiff has had a longstanding pain condition without new symptoms and complains only of worsening pain from his longstanding condition, only conservative treatment options should be made available to him. (Dkt. 31-1, p. 4.)

Plaintiff further asserts that prison medical providers have caused him chronic kidney disease by prescribing NSAID non-steroidal anti-inflammatory drugs ("NSAIDs") medications in large doses for treatment of his pain, especially the drug Indocin, over the past 20 years. NP Worley represents that Plaintiff has Stage II chronic kidney disease (Dkt. 31-1, p. 9) with an estimated Glomerular Filtration Rate (GFR) of 56, but, in a brief review of published chronic kidney disease stages charts, the Court sees that the cut-off mark for Stage 2 is 60, with a GFR level of 56 signifying Stage 3 chronic kidney disease. However, the Court is not a medical expert, and the charts are not admissible evidence without adequate foundation.

In the Initial Review Order, the Court determined that Plaintiff's Complaint stated the following colorable Eighth Amendment medical treatment claims: (1) that Defendants Dr. Rebekah Haggard, Nurse Brewer, and Nurse Practitioner Selah Worley treated him multiple times for his symptoms in the same ways without taking additional or different steps to resolve or reduce his pain; (2) that IDOC medical contract monitor, Rona Siegert, denied his claims and refused to do anything further for him on behalf of the IDOC, putting his surgery consultation on hold indefinitely, (now citing contradictory reasons for that decision); and (3) that the alleged lack of adequate medical treatment resulted from a policy, custom, or practice of Corizon, LLC, based on Plaintiff's allegations that several different medical personnel have sent him down a circular conservative treatment path over and over again with no alleviation of his pain and no follow-up after the steroid

injections did not work—as well as telling him that he cannot obtain specialist care during the COVID-19 pandemic (which has no end in sight).

**REQUEST FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff filed a motion for a temporary restraining order and preliminary injunction. (Dkt. 5.) The Court ordered Defendants to respond to the motion within 14 days after entry of this Order to show cause why Plaintiff should not be provided with a video conference appointment or in-person appointment with Dr. Bradley or an equivalent provider for a surgery consultation, if the follow-up visit has not already been scheduled.

In response to the Court's Order, Corizon scheduled Plaintiff for an appointment with Dr. Bradley's Physician's Assistant, Steve Wren, on October 27, 2020. (Dkt. 31, p. 3; Dkt. 36, p. 1.) PA Wren ordered a new MRI, an EMG, and back x-rays. Plaintiff reports that on December 15, 2020, he was again seen by PA Wren; however, Plaintiff's x-rays were not forwarded to Dr. Bradley's office in time for PA Wren to review them. (See Dkt. 46, p. 2.) There seems to have been no update by either party regarding whether Plaintiff had the MRI and EMG ordered by PA Wren, and, if so, what the results showed. Plaintiff reports that, during the December 15, 2020 appointment, PA Wren ordered another follow-up appointment between Dr. Bradley and Plaintiff to discuss surgery and other options.

**STANDARDS OF LAW**

1. **Standard of Law for Preliminary Injunctions**

Issuance of a preliminary injunction is appropriate where a plaintiff can show that (1) there are "serious questions going to the merits," (2) there is a "a balance of hardships that tips sharply towards the plaintiff," (3) "there is a likelihood of irreparable injury," and (4) "the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

The type of relief a plaintiff is seeking sets the stage for the court's review of whether a preliminary injunction should be granted: (1) a *prohibitory* injunction is intended to preserve the status quo; (2) a *mandatory* injunction "goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored"; and (3) a request for a mandatory preliminary injunction can be granted only if "the facts and law clearly favor the moving party." *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994) (punctuation altered).

In addition, in the prison context, the Prison Litigation Reform Act (PLRA) provides that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. §3626(a)(2). Further, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.; accord Nelson v. Campbell*, 541 U.S. 637, 650 (2004) ("The Prison Litigation Reform Act of 1995 (Act) imposes limits on the scope and duration of preliminary and permanent

**ORDER - 6**

injunctive relief, including a requirement that, before issuing such relief, '[a] court shall give substantial weight to any adverse impact on ... the operation of a criminal justice system caused by the relief.'").

2.  **Standard of Law for Eighth Amendment Claims**

The Eighth Amendment protects the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials] in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). However, medical malpractice or negligence will not support a cause of action under the Eighth Amendment, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm, *McGuckin v. Smith,* 974 F.2d 1050, 1060 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

The Eighth Amendment does not provide a right to a specific treatment, *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), and differences in judgment between an inmate and prison medical providers regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim, *Sanchez v. Vild*, 891 F.2d 240,

**ORDER - 7**

242 (9th Cir. 1989). To state an Eighth Amendment claim "involving choices between alternative courses of treatment," the plaintiff must plausibly allege "that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Stated another way, a plaintiff must plausibly allege that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015). In *Toguchi v. Chung*, where medical records showed that medical personnel had been "consistently responsive to [the inmate's] medical needs," and there was no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," the plaintiff was not permitted to proceed to trial on an Eighth Amendment claim. *Id.*, 391 F.3d at 1061. On the other hand, in *Snow v. McDaniel*, a prisoner was permitted to proceed on his Eighth Amendment claim that for three years prison doctors had ignored the consistent recommendation by two outside specialists that the prisoner needed hip surgery to alleviate his severe pain and mobility issues. *Id.*, 681 F.3d 978, 981 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

### 3. Discussion

The Court has determined that Plaintiff's request for specific treatment at this early stage of proceedings is not appropriate, because the facts do not clearly favor Plaintiff, the moving party. That is not to say that Plaintiff cannot prevail at a jury trial. Rather, presently, many unanswered questions remain about Plaintiff past, current, and future care, and the burden is on Plaintiff to show that he meets the high standard for temporary or preliminary injunctive relief. He has not done so.

The Court preliminarily concluded upon reviewing Plaintiff's Complaint and Motion that his condition was serious enough that he required additional diagnosis from a neurology expert—because that is what the neurology expert recommended if the steroid treatment did not work. Defendants stand on the opinion of a Corizon nurse practitioner with one year of experience (having completed her advanced degree in Fall 2019), in disregarding the neurosurgeon's advice for a follow-up appointment. (Dkt. 31-1, p. 3.) That nurse practitioner determined, "in my medical judgment, it is not urgent or emergent for Mr. Barcella to be seen by an office specialist for evaluation of a potential elective back surgery at this time." (Dkt. 31-1, p. 3.) That course of events is a red flag signaling the need for further investigation.

As Plaintiff describes it, his most recent follow-up visit to Dr. Bradley's PA was merely a stop along the way to a future diagnosis, because PA Wren recommended an MRI and back x-rays. Without those tests, reports, and an opinion from Dr. Bradley (who is under statutory obligation to supervise PA Wren's decisionmaking), Plaintiff has not shown a causal link between Defendants' course of action and Plaintiff's injuries.

**ORDER - 9**

Neither is there any evidence in the record to show whether Plaintiff's (what appears to be Stage 3) chronic kidney disease was caused by the chronic use of NSAIDs over the past 20 years of IDOC incarceration. However, Defendants' disavowal of causation is too vague to leave the issue behind without further investigation. Defendants say his condition was not caused by overuse of NSAIDs for pain management, but they do not point to any of Plaintiff's records that show other potential causes for his chronic kidney disease. A brief review of case law shows that, more than a decade ago, it was known that chronic use of NSAIDs could lead to kidney damage. *See, e.g., Muhammad v. United States*, No. CIV A 08-CV-131-KKC, 2009 WL 3161481, at *3 (E.D. Ky. Sept. 28, 2009) ("While Muhammad continued to request additional or stronger pain medication, a December 8, 2006, note in his medical records indicates a strong concern on the part of the medical staff that, in light of Muhammad's compromised immune system, the chronic use of non-steroidal anti-inflammatory medications (NSAIDs) to address his pain presented a potentially unacceptable risk of kidney or liver damage or ultimately renal failure.")

In conclusion, the Court finds that it is unclear whether Petitioner's back condition requires surgery or a different treatment path. For a variety of reasons, many pain sufferers outside of prison must accept a less-than-perfect solution when surgery is not an option—for example, the best-possible non-opioid/non-NSAID pain medication under the circumstances, ice and heat, meditation training, and/or yoga instruction. It is unclear whether repeated use of the NSAIDs has caused Petitioner's kidney damage. While

Plaintiff has not met his burden of proof at this stage of proceedings to warrant temporary or preliminary injunctive relief beyond an order for Defendants to carry through with providing the neurology expert with the tools needed to complete their diagnosis, the Court *does* see the need for additional medical opinions to help the factfinder in a merits determination.

## MOTION FOR APPOINTMENT OF EXPERT

The Court may permit an expert witness to testify to help the trier of fact determine any fact at issue. Fed. R. Evid. 702. Federal courts have discretion to appoint neutral court expert witnesses. Fed. R. Evid. 706(a)&(d); *Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999). The Court may exercise its discretion to appoint an independent expert witness when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. An example of a complex scientific issues for which an expert would be helpful is "evaluating contradictory evidence about an elusive disease of unknown cause," such as fibromyalgia. *Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999).

Importantly, federal district courts have recognized that, "[r]easonably construed, Rule 706 does not contemplate the appointment of, and compensation for, an expert to aid one of the parties." *See, e.g., Gamez v. Gonzalez*, 2010 WL 2228427, *1 (E.D.Cal. June 3, 2010) (internal quotations, punctuation and citations omitted). The principal

purpose of a court-appointed expert is to assist the trier of fact from a position of neutrality, not to serve as an advocate.[1]

In this matter, there are two separate issues requiring medical expertise. One is whether surgery or a new and different course of treatment is appropriate for Plaintiff's pain, arising from the condition of his spine and nerves. That information can be obtained from Dr. Bradley, the treating physician, in the regular course of treatment. It appears that Dr. Bradley is independent of Corizon and Plaintiff.

The second issue is one of causation of Plaintiff's chronic kidney condition, which is the type of specialized knowledge that would be especially helpful to a layperson factfinder. Therefore, the Court will appoint a Rule 706 expert for a limited purpose. The parties will share the expense of the expert, with the Pro Se Pro Bono Program paying $1,000.00, Plaintiff paying $200.00, and the Corizon Defendants and the IDOC Defendants to each pay one-half of the remaining cost of a nephrologist.

The Court will also appoint pro bono counsel for a limited purpose: to help Plaintiff draft any follow-up requests for disclosure or discovery; to help Plaintiff select two nephrologists who might serve as a court expert; and to review the medical records

---

[1] The *in forma pauperis* statute, 28 U.S.C. § 1915, does not authorize federal courts to appoint or authorize payment for expert witnesses for prisoners or other indigent litigants. Ordinarily, the plaintiff must bear the costs of his litigation, including expert expenses, even in *pro se* cases. *See Pedraza v. Jones*, 71 F.3d 194, 196 (5th Cir. 1995); *Malik v. Lavalley*, 994 F.2d 90 (2d Cir. 1993); *Boring v. Kozakiewicz*, 833 F.2d 468, 474 (3d Cir. 1987) (inmate's dilemma in being unable to proceed with suit because of inability to pay for expert witness was no different than that of non-prisoner claimants who face similar problems; to authorize government funding for such fees would, in effect, be granting inmates better treatment than fellow citizens who are not incarcerated). To help bridge the gap, the Court has instituted the Pro Se Pro Bono Program to aid in the payment of costs for indigent litigants.

and reports of the neurosurgeon and nephrologist with Plaintiff to evaluate the case. At that point, pro bono counsel may decide whether to continue to represent Plaintiff at any settlement conference, in summary judgment proceedings, and/or at a jury trial.

### DISCLOSURE FROM DEFENDANTS AND REQUESTS FOR INFORMATION FROM EXPERTS

During the course of disclosure, Defendants shall disclose to Plaintiff, to the best of their ability to do so, the following:

- the cumulative amount of NSAIDs Plaintiff has consumed each year for each year he has been incarcerated.

- whether, and if so, when, Defendants learned that there was a causal link between NSAIDs and chronic kidney disease recognized in the field of medicine.

- whether, and if so, when, Defendants made decisions to change its prescriptions, if it did, in response to the information about NSAIDs' effects on the kidneys.

Corizon and Plaintiff shall seek the following information from Dr. Bradley (not PA Wren, because, under Idaho law, physician's assistants must be supervised by physicians) in the form of a letter or written report in the course of his continuing consultation:

- Was there a point in time when the age of Plaintiff's back injury decreased its potential curative value or rendered his injury irreparable?

- What course of treatment does Dr. Bradley recommend and why?

- If Dr. Bradley does not recommend surgery, what possible pain medications does Dr. Bradley recommend, taking into consideration Plaintiff's imprisonment, the country's Opioid crisis, and the contraindication for NSAIDs because of Plaintiff's chronic kidney disease?

- If Dr. Bradley does not recommend surgery, what other alternative, complementary, or integrative options does Dr. Bradley recommend for pain management, taking into consideration Plaintiff's imprisonment?

Among other information that the parties believe is important to the chronic kidney disease issue, the nephrologist will be asked to address the following:

- Is it reasonably medically probable that there is a causal link between NSAIDS and Plaintiff's chronic kidney disease?

- Why is a causal link more or less probable based on Plaintiff's medical history?

- What other causes of the chronic kidney disease, if any, are more or less probable from his medical history?

- What is the likely course of Plaintiff's condition for the remainder of his life?

## ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order (Dkt. 5) is DENIED.

2. Defendants' Motion for Extension of Time to File Response (Dkt. 17) is GRANTED. The Response (Dkt. 31) is deemed timely.

3. Plaintiff's Motion for Acceptance of Late Motion (Response) (Dkt. 26) is GRANTED. The Response (Dkt. 27) is deemed timely.

4. Plaintiff's Motions to File Extended Reply (Dkt. 34) and for Extension of Time (Dkt. 35) are GRANTED.

5. Plaintiff's Motion for Extension of Time to File Reply re: Expert Witness and Appointment of Counsel (Dkt. 46) is DENIED as MOOT.

6. Plaintiff's Motion for Appointment of Counsel (Dkt. 40) is GRANTED in part and DENIED in part. The Court's Pro Se Pro Bono Program Coordinator shall take steps to attempt to find limited purpose counsel for Plaintiff immediately. The Coordinator is not always able to find counsel willing to work without compensation, and so Plaintiff should continue to pursue his matter pro se while the search for counsel proceeds.

7. The Clerk of Court shall provide a copy of this Order to the Pro Se Pro Bono Program Coordinator.

8. Plaintiff's Motion to Appoint Expert Witness (Dkt. 40) is GRANTED in part and DENIED in part. No later than **February 26, 2021**, Plaintiff (whether or not counsel has been appointed by that date), the Corizon Defendants, and the IDOC Defendants each shall submit two names of local nephrologists who might serve as the Court's expert in this matter, including the cost of their services. When contacting the nephrologist, the parties shall not give names or details of the case or make any argument in support of their position ex parte, but may generally state that they are looking for a neutral court expert to review medical records and write a report (and potentially testify at trial) regarding whether there is a reasonable medical probability that a prisoner plaintiff's chronic kidney disease was caused

by use of NSAIDs for pain management of a back condition and what Plaintiff's future probably holds for him regarding his kidney condition.

9. Counsel for the Corizon Defendants shall be in charge of ensuring that the bill for the court expert is paid from the funds of all parties, as delineated above.

10. Plaintiff shall withdraw the sum of $200 in such increments as he can afford and forward such payments to counsel for Corizon when counsel provides a bill to him.

11. The Court's Pro Se Pro Bono coordinator shall forward the sum of $1,000 from the program's funds to counsel for the Corizon Defendants for payment of the court expert when counsel provides a bill to the coordinator.

12. Defendants shall supplement their disclosures with the information set forth above no later than **February 12, 2021**. Should Defendants require any information from Plaintiff regarding his past medical history, they shall request supplemental disclosure from him by **January 22, 2021**, and he shall respond by **February 12, 2021**. Plaintiff shall cooperate in providing signed HIPAA releases for any past medical providers requested by Defendants.

13. If counsel is appointed for Plaintiff, then counsel shall confer and suggest in a joint motion to amend the pretrial schedule new supplemental disclosure and discovery deadlines, a new dispositive motion deadline, and a potential time frame for a settlement conference.



DATED: December 31, 2020

B. Lynn Winmill
U.S. District Court Judge